IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KHALIL HAMMOND, DAVID THOMPSON, ANTOINE WALKER, MUWSA GREEN, TYRONE LEONARD, MALIKA HENDERSON, On Their Own Behalf and On Behalf of All Others Similarly Situated | : : : : : : : | CIVIL ACTION |
| v. | : : | |
| PENNSYLVANIA DEPARTMENT OF CORRECTIONS, LAUREL HARRY, Secretary of Corrections, GEORGE LITTLE, Former Secretary of Corrections, MICHAEL WENEROWICZ, Executive Deputy Secretary for Institutional Operations, Pennsylvania Department Of Corrections and LUCAS MALISHCHAK, Director of Psychology, Pennsylvania Department of Corrections | : : : : : : : : : : : | NO. 24-922 |
| MALIKA HENDERSON, KHALIL HAMMOND, DAVID THOMPSON, ANTOINE WALKER, MUWSA GREEN, TYRONE LEONARD, on their own behalf and on behalf of all others similarly situated | : : : : : : : | CIVIL ACTION |
| v. | : : | |
| LAUREL HARRY, Secretary of Corrections, GEORGE M. LITTLE, former Secretary of Corrections, MICHAEL WENEROWICZ, Executive Deputy Secretary for Institutional Operations, Pennsylvania Department of Corrections, LUCAS MALISHCHAK, Deputy Secretary For Office of Reentry, Pennsylvania Department of Corrections and BRIAN SCHNEIDER, Director of Psychology, Pennsylvania Department of Corrections | : : : : : : : : : : : | NO. 24-2290 |

1

| | |
|---|---|
| **ANTOINE WALKER and KHALIL HAMMOND**, on their own behalf and on behalf of all others similarly situated : : : : **v.** : : **LAUREL HARRY**, Secretary of Corrections and **MICHAEL WENEROWICZ**, Executive Deputy Secretary for Institutional Operations, Pennsylvania Department of Corrections | **CIVIL ACTION** : : : : : : : : : : : **NO. 24-2295** |

## MEMORANDUM OPINION

**Savage, J.**                                                              **January 8, 2025**

In these three related putative class actions, plaintiff prisoners assert constitutional and statutory claims against the Pennsylvania Department of Corrections (DOC) and officials challenging their placement in restricted housing throughout the Commonwealth. They claim they have been or were held in solitary confinement, causing or aggravating mental health conditions.

Defendants move to transfer the cases to the Middle District of Pennsylvania where most of the defendants and witnesses are located and which is closer to the plaintiffs and the witnesses. Opposing the motion, plaintiffs argue that their forum choice is not outweighed by other factors.

Balancing the private and public interest factors of convenience and fairness, we find that they weigh in favor of transfer. Therefore, we shall grant the motions.

### Background

The three cases are related, but different. All complain of class members being or having been confined long-term in "extremely small cells," for 21-24 hours a day. The

differences are the reasons they are or were placed in restricted housing units.[1]

## *Hammond*

The *Hammond* plaintiffs purport to represent inmates with a designated mental health condition who are or will be held in restricted housing due to that condition. There are three subclasses: the "Mental Health Class" includes individuals who have ever had a "C" or "D" mental health rating and who are or will be in the Restricted Housing Unit ("RHU"), the Intensive Management Unit ("IMU")[2], or any similar unit;[3] the "Disability Class" includes all individuals who are or will be housed in the RHU, IMU, or similar units and have a mental health condition that substantially limits one or more major life activities; and the "Mental Health Damages Class," which includes all individuals with a "C" or "D" mental health rating who had been in the RHU or IMU at any time since March 4, 2022.[4]

The named plaintiffs are Khalil Hammond, David Thompson, Antoine Walker,

---

[1] *Hammond et al. v. Harry, et al.*, No. 2:24-cv-9220, Am. Compl., ¶¶ 2, 4, 7, ECF No. 29. (E.D. Pa. filed May 29, 2024) ["Am. Compl."].

[2] The RHU is restricted housing for inmates in administrative custody, who are placed there for disciplinary reasons, for administrative reasons, or for security reasons. Inmates in the RHU who are also placed on the Restricted Release List ("RRL") can only reenter general population with the approval of the Executive Deputy Secretary for Institutional Operations ("EDSI"). The IMU is a program for inmates on the RRL that provides them a path to work toward removal from the RRL and to reenter general population. The IMU is comprised of six tiers with privileges added at each tier, with release back to general population at the last phase. An inmate moves through the tiers based on good behavior and participation in the program components, including anger management classes. *Wayne v. Wetzel*, 2024 WL 3696467, * 2-3 (E. D. Pa. Aug. 7, 2024)

[3] The DOC assigns each inmate a letter from A to D on its Mental Health/Intellectual Disability Roster. Am. Compl. ¶ 157. An "A" rating is given to individuals who have no identified psychiatric or intellectual disability needs and no history of psychiatric treatment. A "B" rating is given to those who have a history of psychiatric treatment but no current need for psychiatric treatment or follow-up or support from psychology staff. A "C" rating is given to inmates who are currently receiving psychological treatment, may be receiving psychiatric treatment, including psychotropic medications, but are not diagnosed with a "serious mental illness." Lastly, "D" inmates are currently diagnosed with a serious mental illness, intellectual disability, or "credible functional impairment," or were found "guilty but mentally ill." Am. Compl. ¶¶ 158-61.

[4] Am. Compl., ¶¶ 378-380.

Muwsa Green, Tyrone Leonard, and Malika Henderson.[5] They bring claims under the Eighth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act. Plaintiff Khalil Hammond is in solitary confinement at SCI Phoenix in the Eastern District.[6] He was transferred from SCI Camp Hill in the Middle District in November 2023.[7] David Thompson is incarcerated at SCI Pine Grove in the Western District.[8] Antoine Walker is at SCI Greene in the Western District.[9] Muwsa Green is incarcerated at SCI Houtzdale in the Western District.[10] Tyrone Leonard is at SCI Rockview in the Middle District.[11] Malika Henderson is incarcerated at SCI Muncy in the Middle District.[12] Thus, three named plaintiffs are in the Western District, two in the Middle District, and one in this District.

The defendants are the Pennsylvania Department of Corrections, Laurel Harry, Secretary of Corrections; George Little, former Secretary of Corrections; Michael Wenerowicz, Executive Deputy Secretary for Institutional Operations; Lucas Malishchak, Director of Psychology; and Brian Schneider, Director of Psychology.[13] The individual defendants currently or previously worked at the DOC's Central Office in Mechanicsburg, which is in the Middle District. Three of the five defendants, Harry, Malishchak, and Little,

---

[5] Am. Compl.

[6] *Id.* ¶ 17.

[7] Decl. of David Radziewicz, ECF No. 40-3, attached as Ex. A to Defs.' Mot. to Transfer Pursuant to Local Rule 40.1(c)(2) and 28 U.S.C. § 1404(a), ECF No. 40 ["Radziewicz Decl. - Hammond"].

[8] Am. Compl. ¶ 18.

[9] *Id.* ¶ 19.

[10] *Id.* ¶ 20.

[11] *Id.* ¶ 21.

[12] *Id.* ¶ 22.

[13] Am. Compl.

live in the Middle District.[14]  Wenerowicz and Schneider reside in the Eastern District.[15]

The majority of the putative members of the mental health class in *Hammond* are housed outside the Eastern District.  The putative class includes 1,082 members, 142 of whom are in the Eastern District.[16]  Of those outside, 536 are in the Western District and 404 are in the Middle District.[17]  The mental health damages class, those inmates with mental health difficulties who have been held in restricted housing at some time since March 4, 2022, includes more than 18,000 prisoners, 16,003 of whom are located outside the Eastern District, 8,087 in the Western District and 7,911 in the Middle District.[18]

### *Henderson*

The *Henderson* putative class members are inmates with mental health conditions who have been confined in the RHU or IMU for prolonged periods of time.[19]  Some, not all, are currently in restricted housing.  Henderson has two subclasses: the "Prolonged Solitary Confinement class," consisting of all individuals who are or will be in the RHU, IMU, or similar unit three years or longer, cumulatively or continuously;[20]  and the "Prolonged Solitary Confinement Damages Class," which consists of all individuals who have spent three years or longer, cumulatively or continuously, in the RHU or IMU at any

---

[14] Radziewicz Decl. - Hammond, ¶¶ 20-21.

[15] *Id.* at ¶ 22.

[16] Potential Class Members at the State Correctional Institutions and Distances to Federal Courthouses, ECF 46-1, attached as Ex. A to Defs.' Response to this Court's Order of Oct. 24, 2024, ECF 46.

[17] *Id.*

[18] *Id.*

[19] *Henderson, et al. v. Harry, et al.*, No. 2:24-cv-2290 Compl. ¶ 1, ECF No. 1 (E.D. Pa. filed May 29, 2024) ["Henderson Compl."].

[20] *Id.* ¶ 370.

time since March 4, 2022.[21] There are 241 inmates currently in an RHU or IMU who have been there for three years or longer.[22] Fifty-seven of those inmates are housed in the Eastern District.[23] There are 102 in the Western District and 82 in the Middle District.[24] As of March 4, 2022, there were 1,115 inmates who had previously been housed in an RHU or IMU for three years or longer.[25] Of these, 165 were located in the Eastern District.[26] Of the remaining, there are 537 inmates in the Western District and 414 in the Middle District.[27]

The *Henderson* plaintiffs are Hammond, Thompson, Walker, Green, Leonard, and Henderson.[28] The *Henderson* defendants are Harry, Little, Wenerowicz, Malishchak, and Schneider.[29]

*Walker*

The *Walker* putative class members are inmates on the RRL and those who are in an IMU. They allege violations of their Fourteenth Amendment right to procedural due process.[30] Walker names two subclasses: the "RRL class" comprised of all individuals

---

[21] *Id.* ¶ 371.

[22] *Henderson, et al. v. Harry, et al.*, No. 2:24-cv-2290, Decl. of David Radziewicz, ¶ 22, ECF 14-3, attached as Ex. A to Defs.' Mot. to Transfer, ECF No. 14 (E.D. Pa. filed July 25, 2024) ["Radziewicz Decl. - Henderson"].

[23] *Id.*

[24] *Henderson, et al. v. Harry, et al.*, No. 2:24-cv-2290, Potential Class Members at the State Correctional Institutions and Distances to Federal Courthouses, ECF 19-1, attached as Ex. A to Defs.' Response to Court Order, ECF 19 (E.D. Pa. filed October 30, 2024) ["Henderson Chart"].

[25] Radziewicz Decl. - Henderson ¶ 23.

[26] *Id.*

[27] Henderson Chart.

[28] Henderson Compl.

[29] *Id.*

[30] *Walker, et al. v. Harry, et al.*, No. 2:24-cv-2295, Compl. ¶ 1, ECF No. 1 (E.D. Pa. filed May 29, 2024) ["Walker Compl."].

6

who are or will be on the RRL, and the "IMU class" including all individuals who are or will be in the IMU.[31]

The named plaintiffs are Walker and Hammond.[32] Walker is incarcerated in the Western District and Hammond in the Eastern District.[33] Of the 1,495 inmates in Restricted Housing Units within the DOC, 153 are located in the Eastern District.[34] The DOC has 371 inmates in Security Level 5 status in 25 Specialty Units.[35] Eighty-two of them are in the Eastern District.[36]

Harry and Wenerowicz are the only defendants.[37] Harry lives in the Middle District and Wenerowicz lives in the Eastern District.[38]

*The Department of Corrections*

The DOC's Central Office is 115 miles from the United States Courthouse in Philadelphia and 10 miles from the Harrisburg Courthouse in the Middle District.

The DOC operates 24 prisons in Pennsylvania. Only two of them are located in the Eastern District. Within those 24 prisons, the DOC operates 23 restrictive housing units with more than 1,500 inmates in them. Two restricted housing units are in the Eastern District at SCI Chester and SCI Phoenix. Those two units house 181 inmates.

---

[31] Walker Compl., ¶¶ 247-248.

[32] *Id.*

[33] *Id.* ¶¶ 16-17.

[34] *Walker, et al. v. Harry, et al.*, No. 2:24-cv-2295, Decl. of David Radziewicz, ¶ 9, attached to Commonwealth Defs.' Mot. to Transfer, and Stay Order Until Decision on Mot. to Stay Is Issued, ECF No. 12, ECF No. 14-1 (E.D. Pa. filed July 29, 2024) ["Radziewicz Decl. - Walker"].

[35] *Id.* ¶ 11.

[36] *Id.*

[37] Walker Compl. ¶¶ 16-17.

[38] *Id.*

## Analysis

A defendant moving for transfer of venue bears the burden of demonstrating that: (1) the case could have been brought initially in the proposed district; (2) the proposed district will be more convenient for the parties and the witnesses; and (3) transfer will be in the interest of justice. 28 U.S.C. § 1404(a); *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 57 (3d Cir. 2018) (citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879–80 (3d Cir. 1995)).

The parties agree these actions could have been brought in the Middle District of Pennsylvania. Three of the five individual defendants live in the Middle District and the DOC has its main office there.

Satisfied that these actions could have been brought in the Middle District, we must consider the convenience of the parties and the witnesses. This requires us to evaluate the private and public interests implicated. If balancing these factors tips in favor of transfer, we may transfer the case. *In re Howmedica Osteonics Corp*, 867 F.3d 390, 401 (3d Cir. 2017) (citing *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 62 & n.6 (2013); *Jumara*, 55 F.3d at 879)).

Among the "private interest" factors considered in determining whether transfer is more convenient are: (1) the plaintiff's choice of forum; (2) the defendant's preferred forum; (3) the place where the claim arose; (4) the relative ease of access to the sources of proof; (5) the convenience of the parties in light of their relative financial status and physical location; (6) the availability of compulsory process for the attendance of witnesses; (7) the convenience of the witnesses; and (8) the practical problems that make trial of a case expensive and inefficient.

Unlike the private interest factors, the "public interest" factors are not "tied to the parties." *Howmedica*, 867 F.3d at 402. They consider whether the transfer is in the interest of justice. Those factors include congestion of court dockets and the relationship of the jury and the community to the underlying district, creating a "local interest in deciding [the] local controvers[y]" there. *Id.* (quoting *Jumara*, 55 F.3d at 879). Depending on the nature and the facts of the case, these factors overlap and are intertwined.

Because the analysis involved is flexible and individualized, a court has broad discretion in deciding to transfer venue. *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 132 (3d Cir. 2020) (citing *Jumara*, 55 F.3d at 883). Despite this wide latitude, a court must carefully weigh the factors favoring and disfavoring transfer. *See Jumara*, 55 F.3d at 880.

Plaintiffs argue that we need not consider the private and public interest factors because the proposed venue is in "close proximity" to the Eastern District. Although the Third Circuit has recognized that some courts have refused to apply a multi-factor balancing test where the proposed forum is a short distance away, it declined to adopt a bright-line rule precluding transfer to an adjoining district. *Jumara*, 55 F.3d at 880. Indeed, in that case, "notwithstanding the proximity of the alternative fora," it applied the multi-factor test, now known as the *Jumara* factors, and transferred the case to the Middle District. *Id.*[39] In short, proximity of the proposed district may be considered, but it is not dispositive. A court must still weigh other relevant factors.

---

[39] Plaintiffs cite several district court cases that gave the convenience factor little weight where the two fora were close. This goes to the weight we assign convenience, not to whether we should balance the factors.

## The "Private Interest" Factors

### *Plaintiff's choice of forum*

The plaintiff's choice of forum is typically given "paramount consideration." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970); *see also Kisano Trade & Inv. Ltd. v. Lemster*, 737 F.3d 869, 873 (3d Cir. 2013). The choice of the home forum is given great deference. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255, n.23 (1981) (citing *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)).

In class actions, however, the plaintiff's choice is not afforded the usual deference because the potential class members are scattered throughout numerous fora. *Koster*, 330 U.S. at 524; 1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 2:46 (18th ed. 2021); *see also* 2 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 6:42 (6th ed. 2022) (the "diminished deference" to the plaintiff's choice of forum in class actions "reflects the probability that . . . there will be numerous potential plaintiffs, each possibly able to make a showing that a particular forum is best suited for the adjudication of the class's claim") (internal citations omitted).[40] Although this is not a nationwide class action, this reasoning applies where the prospective class members are situated throughout the Commonwealth in three federal fora.

A sizeable majority of the putative class members are not in the Eastern District. Of the named plaintiffs, only one is in the Eastern District. Most of the putative mental health class members in *Hammond* are housed outside the Eastern District. As noted

---

[40] Although *Koster* involved a policyholder's derivative action, district courts in the Third Circuit have applied its reasoning to class actions. *Scanlan v. Am. Airlines Grp., Inc.*, 366 F. Supp. 3d 673, 677 (E.D. Pa. 2019) (citing *Koster*, 330 U.S. at 519) (collecting cases); s*ee, e.g., Impervious Paint Industries, Ltd. v. Ashland Oil, Inc.*, 444 F. Supp. 465, 467 (E.D. Pa. 1978) ("[W]here there are many potential plaintiffs scattered across the country, the [forum] choice of th[e named] plaintiff deserves less weight.") (citing *Koster*, 330 U.S. 518).

earlier, the mental health class likely includes around 1,082 putative class members, 940 of whom are located outside the Eastern District. The damages class includes more than 18,000 putative class members, 16,003 of whom are located in other districts.

Of the 241 prospective class members in *Henderson*, 57 are housed in the Eastern District.[41] As of March 4, 2022, there were 1,115 putative class members making up the damages class who had previously been housed in an RHU or IMU for three years or longer.[42] Only 165 of them are in the Eastern District.[43]

Most of the putative class members in *Walker* are housed outside the Eastern District. Of the 1,495 prospective *Walker* class members in Restricted Housing Units, 153 inmates are located in the Eastern District. Of the 371 inmates in Specialty Units in Security Level 5 Status within the DOC who would qualify for damages, 82 are located in the Eastern District.[44]

Plaintiffs point out that each class representative is an essential witness whose participation "will be substantial."[45] They contend they "have particular … expertise on the factual underpinning of the class claims."[46]

Plaintiffs argue that four of the six named plaintiffs in *Hammond* and *Henderson* are from the Eastern District and have family here, the single largest prison is in the Eastern District, and litigating here is convenient for plaintiffs' counsel. *Jumara* looks to

---

[41] Radziewicz Decl.- Henderson, ¶ 22.

[42] *Id.* ¶ 23.

[43] *Id.*

[44] Radziewicz Decl. - Walker, ¶ 11.

[45] Plaintiffs' Response in Opposition to Defendants' Motion to Transfer, at 10, ECF 44 ["Response"].

[46] *Id.*

where plaintiffs reside, not where they formerly resided. Although the largest prison is in the Eastern District, the vast majority of the individuals incarcerated by the DOC involved in these cases are located outside the Eastern District.

The same rationale applied to national class actions applies to class actions that cover an entire state having three judicial districts. Here, the chosen forum has a lesser connection to the claims than does the Middle District and the class members are scattered throughout the Commonwealth with the majority outside this district. Thus, although the plaintiffs' chosen forum is entitled to deference, we do not accord it the usual deference.

### *Defendant's Forum Preference*

The defendants' preference is a consideration. *Jumara*, 55 F.3d at 879. However, a defendants have the burden of establishing why the court should override the plaintiffs' choice. Without more, the defendants' preference alone does not justify transfer.

Defendants prefer the Middle District of Pennsylvania because it is where the DOC is headquartered and where the challenged guidelines were promulgated. All individual defendants work in the Middle District and three of them live in that district. These facts favor the defendants' choice of forum.

### *Where the Claim Arose*

Where the claim arose implicates other factors in the analysis. It involves questions of access to proof, convenience of the parties and the witnesses, availability of witnesses, and efficiency concerns. Hence, determining the place where the claim arose will inform the evaluation of these other factors.

The plaintiffs' claims arise out of their confinement in prisons throughout Pennsylvania. Most are or were confined outside the Eastern District. Only two of the 24 prisons operated by the DOC are located in the Eastern District. Most of the prospective class members reside in the Western and Middle Districts.

Plaintiffs argue that this factor is neutral because one plaintiff, Hammond, was harmed in the Eastern District. Where a plaintiff is incarcerated in one district and allegedly harmed by policies made in another district, claims arise in both districts for purposes of venue. *Stradford v. Wetzel*, 2017 WL 1196656, at *3 (E.D. Pa. Mar. 31, 2017); *Chimenti v. Pennsylvania Dept. of Corr.*, 2016 WL 1125580, at *12-13 (E.D. Pa. Mar. 21, 2016). The policies at issue were formulated in the Middle District. The harm those policies allegedly caused occurred in prisons in the Western, Middle, and Eastern Districts. This factor does not favor the case remaining in this district.

*Location of Books and Records*

Defendants argue most of the relevant documents are located in the Middle District. Policy records and electronic correspondence are maintained in the DOC Central Office and the Office of Administration. Both are in the Middle District. An inmate's records are kept where the inmate is housed. Thus, the inmate records are scattered throughout Pennsylvania and most of the prisoner records are located outside the Eastern District.

The location of books and records no longer has the impact on convenience it had. *Cousins on behalf of Est. of Cousins v. Sikorsky Aircraft Corp.*, No. CV 23-2629, -- F. Supp.3d -- , 2024 WL 4429061, at *7 n.73 (E.D. Pa. Sept. 30, 2024). It is not significant because the application of this factor is limited to the extent to which the files could not

13

be produced in the alternative forum. *Jumara*, 55 F.3d at 879. Files can be produced electronically. This factor is neutral.

*The Convenience of the Parties and the Witnesses*

None of the witnesses will be unavailable for trial regardless of where the case is litigated. But, the convenience of the parties and the witnesses is a significant issue in this case with many witnesses in institutions throughout Pennsylvania. Undoubtably, witnesses describing the conditions of confinement at the various prisons include inmates and DOC personnel at those prisons. DOC medical and psychiatric professionals at those institutions will testify regarding treatment of the inmates claiming the effects of the confinement. Defendants will have to coordinate and transport the witnesses testifying about the conditions of confinement and the consequences of the confinement to the Eastern District, which is less convenient and more costly than transporting them to the Middle District.

Significant logistical difficulties will impact DOC financial and personnel resources. Most of the representatives of the putative classes who will testify reside in the Western or Middle Districts. The DOC will bear the cost of transporting these inmates from both the Middle and Western Districts to the Eastern District. These costs in both time and money are significant, impacting the safety and efficiency of prison operations.

Female inmates may not be housed in a male institution.[47] Female class members and witnesses cannot be temporarily housed in the Eastern District. The only female institutions are at Muncy and Cambridge Springs, in the Middle and Western Districts,

---

[47] Decl. of Erin Brown ¶ 14, ECF No. 47-1, attached as Ex. A to Defs.' Resp. to This Court's Verbal Order on November 12, 2024, ECF No. 47 ["Brown Decl."].

respectively.[48]  Transportation to Philadelphia would require either a 316-mile roundtrip from Muncy or a 766-mile round trip for inmates from Cambridge Springs, each day of trial.[49]  That roundtrip would be significantly more expensive if the inmates were transported to Philadelphia than if they were transported to Harrisburg.

The logistical difficulties are not limited to female inmates.  Male inmates who are classified as a security Level 5 must be housed in facilities with Level-5 beds.[50]  Currently, the two DOC facilities in the Eastern District, SCI Phoenix and SCI Chester, maintain a combined total of 82 Level 5 beds.[51]  However, all beds are not available because of limited DOC staff and resources.[52]

There are seven facilities that can house inmates for trial in Harrisburg.[53]  Those facilities have a combined total of 291 beds.[54]  The Department claims that it would be better able to transport inmates for trial in Harrisburg because there are a greater number of housing options available.

The class members are high risk inmates who have been placed, deservedly or not, in restricted housing units for security reasons.  Level-5 inmates have demonstrated a pattern of escapes or attempted escapes, maladjusted or assaultive behavior, or need of protection.[55]  Inmates are assigned H-code high risk because of assaultive behavior in

---

[48] *Id.* ¶ 15.

[49] *Id.*

[50] Inmates in Security Level 5 are kept in various solitary confinement units, including but not limited to the IMU and RHU.  Am. Compl. ¶¶ 2, 85.

[51] Brown Decl. ¶ 18.

[52] *Id.*

[53] *Id.* ¶ 19.

[54] *Id.*

[55] *Id.* ¶ 6.

the last 12 months, membership in a security threat group, conviction of a forcible felony, an escape history, having more than ten years remaining on their sentences, or serving a capital or life sentence.[56]

Transportation of Security Level-5 inmates is time consuming. It takes 30 minutes to prepare a Security Level-5 inmate for transport and 30 minutes to process him at the destination.[57] Additionally, inmates with high transport risk assessments or medical restrictions must be transported individually in a car or specialized transport van with additional escort staff.[58] It takes an hour to prepare these high risk inmates for transport.[59] The Level-5 inmates require at a minimum three corrections officers during transport.[60]

Pulling staff from other institutions for transport results in loss of manpower in other institutions, increasing overtime and raising heightened security risks. The farther the transport, the greater the costs and risks.

The DOC faces higher costs to transport inmates to Philadelphia than to Harrisburg. The average cost to transport an inmate from a DOC facility to Philadelphia is $2.54 per mile.[61] The average per diem cost, including staffing the transport, overtime to fill posts vacated at the facility from which the transport officers were assigned, overtime

---

[56] *Id.* ¶ 7.

[57] Decl. of William Nicklow ¶ 7, ECF No. 47-2, attached as Ex. B to Defs.' Resp. to This Court's Verbal Order on November 12, 2024, ECF No. 47 ["Nicklow Decl."].

[58] *Id.* ¶ 8

[59] *Id.* ¶ 10.

[60] *Id.* ¶ 9.

[61] Decl. of Nicolette Cawley ¶ 12, ECF No. 47-3, attached as Ex. C to Defs.' Resp. to This Court's Verbal Order on November 12, 2024, ECF No. 47 ["Cawley Decl."].

for the transporting officers, lodging and other travel costs, to transport a high-risk inmate to court in Philadelphia is $5,157.74.[62]

The average cost-per-mile to transport an inmate to court in Harrisburg is $2.03.[63] The average daily cost to transport a high-risk inmate to court in Harrisburg is $3,860.40.[64] Depending on the number of inmates who will be called as witnesses, these costs will increase proportionally. For example, if one high-risk inmate from each DOC facility is transported to and from the United States Courthouse in Philadelphia, the DOC will incur a total average cost of $261,380.96.[65] If one high-risk inmate from each facility is transported to and from the United States Courthouse in Harrisburg, the cost is $190,010.02, resulting in a difference of $71,370.94.[66]

In sum, the DOC would incur expenses for travel and lodging for the witnesses, DOC inmates, medical professionals, and administrative personnel, to testify in Philadelphia. Those costs would be significantly less if the cases are litigated in the Middle District. Further, three of the defendants live in the Middle District, making the Middle District a more convenient forum. The convenience to the parties and the witnesses factor weighs heavily in favor of transfer.

*Practical Considerations*

Defendants argue this factor weighs in favor of transfer because the "entire policy-making apparatus" of the DOC is in the Middle District. If the trial is in the Eastern District,

---

[62] *Id.* ¶¶ 10, 14.

[63] *Id.* ¶ 15.

[64] *Id.* ¶ 17.

[65] *Id.* ¶ 21.

[66] *Id.* ¶ 23.

defendants will incur substantial travel, lodging for DOC officials, and personal expenses. This factor favors transfer.

### *Relevant Court Congestion*

We consider the relative congestion of the dockets in the Middle and the Eastern Districts of Pennsylvania. Defendants note the Eastern District serves a more populous area and potentially has greater congestion.

As of June 30, 2024, the Eastern District of Pennsylvania had an average of 382 pending cases per judgeship.[67] The Middle District of Pennsylvania had an average of 573 cases pending per judgeship.[68] Therefore, although the Eastern District has a higher total number of cases, it is less congested than the Middle District.[69] Accordingly, the relative congestion of the courts weighs slightly against transfer.

### *Local Interest in Deciding Local Controversies at Home*

One named plaintiff is housed in the Eastern District. Most defendants reside in the Middle District. That a plaintiff has family in the district does not move the meter in favor of transfer. Family members are not parties or witnesses. What effect their relatives' confinement had on them does not factor into the convenience analysis. Nonetheless, there is little competing interest in deciding controversies between neighboring districts in the same state. *See Jumara*, 55 F.3d at 882-83. This factor is neutral.

---

[67] U.S. District Courts, Combined Civil and Criminal Federal Court Management Statistics, National Judicial Caseload Profile (June 30, 2024), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0630.2024.pdf. (last visited January 7, 2025).

[68] *Id.*

[69] *Id.*

## Conclusion

After carefully weighing the private and public interests, we conclude that the balance tips in favor of transfer to the Middle District. The plaintiffs' choice of forum, although entitled to deference, is significantly outweighed by the convenience of the parties and the witnesses, including the plaintiffs. Therefore, we shall grant the motions to transfer.